NOT FOR PUBLICATION                    (Docket Nos. 49, 51, 64, 72, 74, 86)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____    :
                                   :
JERMAINE GEORGE JUMPP and          :
MICHAEL CLIFTON ADAMS, JR.,        :
                                   :
        Plaintiffs,                :       Civil No. 08-6268 (RBK/KMW)
                                   :
        v.                         :       **OPINION**
                                   :
RODNEY JERKINS, RODNEY JERKINS     :
PRODUCTIONS, INC.,                 :
INTERSCOPE GEFFEN A & M,           :
UNIVERSAL MUSIC GROUP, INC.,       :
UNIVERSAL MUSIC CORP.,             :
SHAWN C. CARTER, CARTER BOYS       :
MUSIC, TEAM S. DOT PUBLISHING,     :
GARRETT R. HAMLER, XAVIER          :
CRAIG BROCKMAN, CRAIGMAN           :
MUSIC, CHARLES CORNELIUS MIMS,     :
STATE ONE SONGS AMERICA,           :
EMI BLACKWOOD INC., HITCO          :
MUSIC, and MARY J. BLIGE,          :
                                   :
        Defendants.                :
_____    :

**KUGLER**, United States District Judge:

        This matter arises out alleged copyright infringement of a song authored and owned by

Plaintiffs Jermaine George Jumpp and Michael Clifton Adams, Jr.[1]  Presently before the Court

_____

        [1] As of the date of this Opinion, Plaintiff Michael Adams stipulated to dismissal with
prejudice as to some of the Defendants to this action.  See Docket Nos. 113, 115.  However,
since he has not reached an accord with all Defendants, he is still considered a party to the
pending motions.

1

are three motions to dismiss for insufficient service of process under Federal Rules of Civil Procedure 12(b)(5) and 4(m) by the following Defendants: 1) Rodney Jerkins, Rodney Jerkins Productions, Inc. (RJP), and EMI Blackwood Music (collectively, the Jerkins Group**)** (Docket No. 49); 2) Team S. Dot Publishing, Garrett R. Hamler, and Hitco Music[2] (collectively, the Hamler Group) (Docket No. 51); and 3) Xavier Craig Brockman,[3] and Craigman Music (collectively, the Brockman Group) (Docket No. 64).  In response to each of these motions, Plaintiffs have filed a Cross Motion for an Extension of Time to Serve (Docket Nos. 72, 74, 86).  For the following reasons, the Court denies all Motions to Dismiss and grants all Cross Motions.

## I.    BACKGROUND

In brief, Plaintiffs Jermaine George Jumpp and Michael Clifton Adams, Jr. claim that the "Defendants"[4] published a song entitled "Enough Cryin'" performed by Mary J. Blige that is substantially similar to their copyrighted song, "On My Grind."  Plaintiffs claim that around 2001, four years before Enough Cryin's publication, Defendants had access to their song.  Plaintiffs filed suit on December 19, 2008 alleging a single count of copyright infringement.  Thereafter, they filed an Amended Complaint on April 16, 2009, which did not materially change the prior pleading.

Two dates are significant at the outset of this discussion: 1) December 20, 2008, and 2) April 20, 2009.  All moving parties and the Plaintiffs themselves seemingly agree that the statute

---

[2] Hitco's proper name appears to be Hitco Music Publishing LLC.  See Hamler br. at 1.

[3] Xavier Craig Brockman's proper name appears to be Craig Xavier Brockman.  See Brockman br. at 1.

[4] Plaintiffs do not allege specifically which of the sixteen Defendants infringed their song.

of limitations on some of Plaintiffs' claims for damages ran on December 20, 2008 – just one day after the Complaint was filed.  See Pl. br.(74)[5] at 1; Jerkins reply at 6; Hamler reply at 2; Brockman reply br. at 14.  All parties also seemingly agree that April 20, 2009 was the 120th day after Plaintiffs filed suit, making it the last day on which Plaintiffs could serve process under Rule 4(m).  See Pl. br.(74) at 4; Jerkins br. at 1; Hamler br. at 2; Craigman br. at 1.  What is also significant at the outset is that at no time did Plaintiffs ever request an extension of time during the service period to effect service.

Plaintiffs began the 120 service period by mailing a package to all Defendant just three days after they filed the original Complaint.  The package contained 1) a cease and desist letter, 2) a copy of the Complaint as filed, and 3) a CD containing both the copyrighted song and the purported infringing song.  Redwine Decl. at ¶ 3.  While it is not clear on the record whether this package was sent to the correct addresses, none of the moving Defendants seemingly dispute that the package was sent.  See Jerkins reply at 4; Hamler reply at 10-11; Brockman reply at 8-9.  In the package was a letter from William Heller, counsel for Plaintiffs, who explained that in order to facilitate discussion, the Complaint had been filed but not served.  Pl. br.(74), Ex. A at 3.  Also during the 120 period, Plaintiffs seemingly attempted to change counsel, even going so far as to file the Amended Complaint pro se.  William Heller also filed a motion to withdraw.

Allegedly because of Plaintiffs' attempts to settle the case and their attempt to change counsel, they did not attempt to effect service on any of the Defendants in the action until April 20, 2009 – the last day for service under Rule 4(m).  Because the facts surrounding each attempt

---

[5] Because Plaintiffs have three briefs filed with the Court, Plaintiffs' briefs are cited to by docket number.

at service (and the pre-service efforts to resolve the dispute) differ for each of the moving Defendants, they are recounted separately here.

### A.      Service on the Jerkins Group

EMI Blackwood is a music publishing company engaged in the business of licensing and exploiting musical compositions.  Dallas affid. at ¶ 3.  Rodney Jerkins is a professional songwriter and producer.  Jerkins affid. at ¶ 3.  Jerkins is the principal officer of RJP.  Jerkins affid. at ¶ 1.  Jerkins attests that RJP entered into a contractual relationship with EMI to provide musical compositions.  Jerkins affid. at ¶ 3.  He asserts that he is not an employee of EMI, he does not have offices there, and it is not his agent for service.  Jerkins affid. at ¶ 4.

On January 5, 2009, Stephen Dallas, Senior Director for Legal and Business Affairs at EMI Blackwood Music responded via email to Plaintiffs' December 22 package.  Dallas acknowledged receipt of the package, but not the copyrighted song.  Pl. br.(74), Ex. C.  The next day, Plaintiffs' counsel emailed him copies of the songs, the cease and desist letter, and the original Complaint.  Redwine decl. at ¶ 6.  Mr. Dallas confirmed receipt of the documents and the email the same day.  Pl. br.(74), Ex. D.  On February 24, 2009, Mr. Dallas responded via certified mail and email that EMI "on behalf of itself and its writers" rejected Plaintiffs' infringement claim.  Pl. br.(74), Ex. E.  Plaintiffs understood the rejection letter to be on behalf of EMI Blackwood, Rodney Jerkins, and RJP.  Pl. br.(74) at 3.

### 1.      Initial Service

On April 20, 2009, Plaintiffs' process server, Kelvi Frias, went to EMI's headquarters at 75 Ninth Avenue, 4th Floor, New York, New York 10011 to serve Rodney Jerkins, RJP, and EMI.  This address was the same address to which Plaintiffs had originally mailed their package

to RJP and EMI.  Upon arrival at EMI's office, Frias was greeted by the receptionist, "Mr. Munsie."  Frias affid. at ¶ 3.  Frias attests that before he served process on Mr. Munsie, Frias asked Munsie if he was authorized to accept service on RJP and EMI Blackwood.  Frias affid. at ¶ 4.  Mr. Munsie purportedly confirmed that he was and Frias served him with the summons and the original and amended Complaints.  Frias affid. at ¶ 4.  Plaintiffs allege Frias later returned to EMI's office the same day and asked Mr. Munsie if he was authorized to accept service on Rodney Jerkins, and Munsie confirmed that he was.  Frias affid. at ¶¶ 6-7.  Frias then served him with process.

Jerkins, RJP, and EMI flatly refute Plaintiffs' allegations.  They submit the affidavit of Michael Munsie who attests that while he is in fact the receptionist at EMI, he is not authorized to accept service on behalf of any of these Defendants.  Munsie affid. at ¶¶ 1, 4, 6.  He attests that it is his practice to direct process servers to contact the in-house legal department.  Munsie affid. at ¶ 5.  Munsie also states that while he has no specific recollection of Frias's service attempt, he is "certain" that he did not advise that he was authorized to accept service.  Munsie affid. at ¶ 7.

### 2.    Additional Service

Plaintiffs also assert that they attempted additional service on each of these Defendants; however, each attempt was outside of the 120 day period.  For example, on May 22, 2009, Plaintiffs served EMI's registered agent for service, Corporation Service Company.  Dallas affid. at ¶ 8.  Plaintiffs also maintain that they served RJP's registered agent for service, Raymond P. Kondler, on May 26, 2009.  Jerkins counters that he "do[es] not believe that [Mr. Kondler] is currently a registered agent for [RJP]."  Jerkins affid. at ¶ 8.  Finally, Plaintiffs assert that they personally served Jerkins on June 2, 2009 at his New Jersey residence after several unsuccessful

attempts. Redwine decl. at ¶ 14. Jerkins counters that the residence at which service was left was not his address. Jerkins affid. at ¶ 8.

### B.     Service on the Hamler Group

Garrett Hamler is a Georgia resident who lives in Atlanta, Georgia. Hamler decl. at ¶ 3. Hamler is a songwriter and recording artist who records under the professional name "Sean Garrett." Hamler decl. at ¶ 2. Team S Dot Publishing is a fictitious name under which Hamler conducts personal business in the music industry and is allegedly not an actual corporate entity. Hamler decl. at ¶ 5. Hitco's relationship to Hamler is not clear on the record, other than it shares a contact address with Team S Dot Publishing in the Broadcast Music, Inc. (BMI) register.[6] Pl. br.(72), Ex. B.

### 1.     Initial Service

On April 20, 2009, Plaintiffs allege they simultaneously served both Hitco and S Dot at the office of Bug Music located at 7750 Sunset Blvd., Los Angeles, California 90046. Pl. br.(72) at 4. Bug Music acquired Hitco's parent company, Windswept Holdings, LLC. Pl. br.(72) at 4. Plaintiffs' process server, Adrian Marquez, attests that when he arrived at Bug Music's offices he asked the receptionist "Roberto S." whether Hitco Music and Team S Dot Publishing were located there. Marquez affid. at ¶ 4. Roberto S. confirmed that they were. Marquez affid. at ¶ 4. When Marquez asked Roberto for his job title, he said he was a receptionist and he represented that he was an employee of both Hitco and Team S Dot Publishing. Marquez affid. at ¶ 5.

---

[6] Among other things, BMI seemingly compiles data on songs including songwriters, composers, publishers, and artists. Pl. br.(72), Ex. B. For the song "Enough Cryin'" the publishers are listed as EMI, Hitco Music, Team S Dot Publishing, and "Additional Non-BMI Publishers." Pl. br.(72), Ex. B.

Marquez then informed Roberto S. that he needed to serve legal papers on Hitco and S Dot, and Marquez asked Roberto S. to give the documents to the legal department.  Marquez affid. at ¶ 6. Roberto S. apparently agreed and he accepted the documents.  Marquez affid. at ¶ 6.

In direct opposition to Plaintiffs' representations, S Dot and Hitco have produced the declaration of Roberto Rodriguez, the receptionist for Bug Music.  Rodriguez attests that he never received a summons or a complaint and that he is not an employee of either S Dot or Hitco. Rodriguez decl. at ¶¶ 2-3.  S Dot and Hitco take pains to argue that Rodriguez could not be Roberto "S" because his name is Roberto "R," see Hamler reply at ¶ 6, but they do not state whether the physical description of Roberto S. in the Amended Proof of Service fits Rodriguez. Pl. br.(72), Ex. C.

As to Garrett Hamler, Plaintiffs also attempted service on him on April 20, 2009 at his music publishing company, The Young Pen Publishing Co., at Ten Piedmont Center, Suite 100, 3495 Piedmont Road, NE, Atlanta Georgia 30305.  Pl. br.(72) at 4.  This address was the same address to which Plaintiffs sent their original package.  Unfortunately, the office was closed.

The process server returned the next day and was informed that Hamler was not there and that Hamler only used the address to open his music publishing company.  Hill affid. at ¶ 3.  The person that was there, Colin Blaylock, did not accept service.  Pl. br.(72) at 5.  Thus, the next day, April 23, Plaintiffs called BMI's legal department to confirm if it were authorized to accept service on behalf of Hamler, its artist.  Redwine decl. at ¶ 11.  Cleo Kariolis, a secretary in BMI's legal department, confirmed that it would accept service and told Plaintiffs to ask for her by name.  Redwine decl. at ¶ 11.  When Plaintiffs' process server arrived later that day, he asked for Kariolis, but the office manager Joan instructed him to leave the documents with her, saying she

7

was authorized to accept service.  Hickey affid. at ¶¶ 3-4.

### 2.     Additional Service

Around May 4, 2009, Jeffrey Movit, counsel for the Hamler Group contacted Plaintiffs'

counsel, purportedly to request an extension of time to answer the Amended Complaint.

Redwine decl. at ¶ 12.  Plaintiffs' counsel agreed to the extension on the condition that Movit

agree not to contest service upon his clients, including Defendant Mary J. Blige.  Redwine decl.

at ¶ 12.  Plaintiffs attached an email chain between Movit and Redwine wherein Movit wrote the

following on May 11: "Per your prior offer, I am authorized to accept service of the Amended

Complaint on behalf of Ms. Blige in exchange for your office's signature on the attached

stipulation, which stipulation would extend Ms. Blige's deadline to move, answer or otherwise

respond to the amended complaint to June 10, 2009."  Pl. br.(72), Ex. D.  The email mentioned

nothing of a waiver of service as the Hamler Group.  Partly on the basis of this email, the Hamler

Defendants refute that they waived an objection to service, and point out that the only waiver was

by Blige.  Hamler reply at 8-9.

Thereafter, Plaintiffs attempted to re-serve Hamler and S Dot at Hamler's personal

residence and business on at least five separate occasions, from June 29, 2009 to July 2, 2009.

Plaintiffs were never successful.  As to Hitco, on June 30, 2009, Plaintiffs directed their process

server to serve Hitco's registered agent with the California Secretary of State, Evan Medow, in

California.  Redwine decl. at ¶ 16.  The server could not find Medow at the listed address and

was informed that he no longer worked there.  Redwine decl. at ¶ 16.  On July 1, 2009, Plaintiffs'

counsel called Hitco and spoke to a receptionist named Roberto, who stated that Hitco's agent

was CT Corporation.  Redwine decl. at ¶ 17.  On July 2, 2009, the process server attempted to

effect service on CT Corporation but was informed that it was not authorized to accept service on behalf of Hitco.  Redwine decl. at ¶ 17.

### C.    Service on the Brockman Group

Craig Xavier Brockman is a professional songwriter.  Brockman decl. at ¶ 2.  Craigman Music is the music publishing company that he formed for the purpose of acting as his publisher with the American Society of Composers, Authors and Publishers (ASCAP).  Brockman decl. at ¶ 3.  Craigman Music is solely owned by Brockman and is not a corporate entity.  Brockman decl. at ¶ 3.

#### 1.    Initial Service

On April 20, 2009, Plaintiffs attempted to serve Brockman and Craigman Music at 6 East 32nd Street, 11th Floor, New York, New York 10016, the same address to which Plaintiffs mailed the original package.  Redwine decl. at ¶ 5.  That address was for the offices of Cherry Lane Music Publishing.  Redwine decl. at ¶ 5.  Plaintiffs obtained the address from the ASCAP register, which lists addresses for music licensing administrators.  Redwine decl. at ¶ 4.  The address for Craigman Music was listed as above, care of Cherry Lane Music.  Pl. br.(86), Ex. B.

When the process server, Kelvi Frias, arrived at the offices of Cherry Lane, he informed the receptionist that he had legal papers to serve on Xavier Craig Brockman and Craigman Music.  Frias affid. at ¶ 3.  Frias attests that the receptionist then called an attorney, Keith "Hauprech," to the reception area.  Frias affid. at ¶ 3.  When Hauprech arrived, Frias claims he asked him if he was authorized to accept service on behalf of Xavier Craig Brockman and Craigman Music, and Hauprech confirmed that he was.  Frias affid. at ¶ 4.  Frias then served him with process.  Frias affid. at ¶ 5.

In response, the Brockman Group produced the declaration of Keith "Hauprich." He attests that he is the Vice President of Business & Legal Affairs for Cherry Lane Music Publishing Company, Inc. Hauprich affid. at ¶ 1. Hauprich confirms that a process server did appear at Cherry Lane's offices on April 20, 2009 and the server did leave service for both Brockman and Craigman Music. Hauprich affid. at ¶ 3. However, Hauprich attests that he never told the process server that he was authorized to accept service on their behalf. Hauprich affid. at ¶ 3. In fact, Hauprich attests that the process server only asked him if he was authorized to accept service for State One Songs America and Brockman, to which Hauprich expressly advised the process server that he could not accept service on their behalf. Hauprich affid. at ¶ 4.

### 2.   Additional Service

Plaintiffs later re-served Brockman personally at his home in California on June 2, 2009. Redwine Decl. at ¶ 12. Plaintiffs also attempted to serve Brockman with the Craigman Music summons and complaint at his home at least six separate times from July 8, 2009 to July 19, 2009. Redwine decl. at ¶12. However, Plaintiffs also allege that they re-served Craigman Music at the headquarters of State One Music, Craigman Music's current ASCAP royalties administrator, at 32 E. 31st Street, 12th Floor, New York, New York 10016. Redwine decl. at ¶¶ 5, 12. Specifically on May 28, 2009, Plaintiffs' process server, Darlene Greene, went to that address and approached the receptionist. Greene affid. at ¶ 3. Greene alleges that she told the receptionist that she had legal papers to serve on Craigman Music and the receptionist called Neil Gillis, president of State One Music, to the reception area. Greene affid. at ¶ 4. Greene then asked him if he was authorized to accept service on behalf of Craigman, and after he confirmed that he was, Greene served him. Greene affid. at ¶ 5.

10

**D.    Procedural History**

On June 10, 2009, Defendants Rodney Jerkins, RJP, and EMI Blackwood filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 4(m), 12(b)(2), and 12(b)(5).[7]  Team S Dot Publishing, Garret R. Hamler, and Hitco Music likewise filed a Motion to Dismiss under Rule 12(b)(5) on the same day.  Craig Xavier Brockman and Craigman Music followed suit on June 19, 2009 with a Motion to Dismiss under Rule 12(b)(5).  Plaintiffs responded to each individual Motion and filed a Cross Motion for an Extension of Time to Serve.  Defendant Mary J. Blige, who is not a moving party, filed her own brief in opposition to the Jerkins Group's Motion to dismiss, arguing they are integral parties to Blige's counterclaim for indemnifcation.

**II.    STANDARD**

Because several principles of law are applicable to each of the moving Defendants, they are laid out generally here.  It should be noted that the inquiry in each case is really threefold: 1) whether Plaintiffs actually served each moving Defendant; and if not 2) whether the Court *must* grant an extension of time to effect service on the particular Defendant, or 3) whether the Court in its discretion *should* grant an extension.

Under Federal Rule of Civil Procedure 12(b)(5), a party may move to dismiss for insufficient service of process.  The burden is on the party serving process to show that service

_____

[7] While the Jerkins Group moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2), and while a court lacks personal jurisdiction over an unserved party, see Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd., 484 U.S. 97, 104 (1987), the inquiry below is limited to Rules 4(m) and 12(b)(5).  Necessary preconditions for the success of the Jerkins Group's motion under 12(b)(2) are 1) a finding that they were not properly served and 2) no grant of additional time for service under Rule 4(m).  Because the Court otherwise finds that an exercise of its discretion is warranted to permit additional time for service of process, the motion under Rule 12(b)(2) is premature.

was valid.  Grand Entm't Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 488 (3d Cir. 1993).

Service of process is governed by Federal Rule of Civil Procedure 4.  An individual is served by

1) following state law for serving a summons in the state where the district court is located or

where service is made; 2) personal service; 3) leaving the summons and the complaint at the

individual's "usual place of abode with someone of suitable age and discretion who resides

there"; or 4) serving process upon an agent "authorized by appointment or by law" to receive

service. Fed. R. Civ. P. 4(e).  A corporation, partnership, or association can be served by 1)

following state law as just discussed; or 2) by delivering the summons and the complaint to "an

officer, a managing or general agent, or any other agent authorized by appointment or by law."

Fed. R. Civ. P. 4(h).

Under Rule 4, if a defendant is not served within 120 days after the complaint is filed, the

court "must dismiss the action without prejudice against that defendant or order that service be

made within a specified time."  Fed. R. Civ. P. 4(m).  However, if a plaintiff shows "good cause"

for the failure to timely serve, the court "must extend" the time for service.  Id.  Rule 4(m) is part

mandatory and part discretionary.  Thus, when determining whether to grant an extension of time

to serve process, a court must engage in a two part inquiry.  See Petrucelli v. Bohringer &

Ratzinger, 46 F.3d 1298, 1307 (3d Cir. 1995).  First, the court must determine whether good

cause exists for an extension, and if it does, grant the extension and end the inquiry.  Id.  Second,

if good cause is lacking, the court must decide whether to dismiss the complaint without

prejudice or to exercise its discretion and extend time for service – notwithstanding the lack of

good cause.  Id.  In fact, a court abuses its discretion by using its good cause analysis to find an

exercise of discretion is unwarranted per se.  See Boley v. Kaymark, 123 F.3d 756, 758-60 (3d

Cir. 1997).  In other words, it is not enough for the court to say that if it finds no good cause, there is per se no discretionary reason to grant an extension; good cause and discretion are distinct inquiries.  See id. at 758.

As to the first inquiry, "a court's primary focus is on the plaintiff's reasons for not complying with the time limit in the first place."  MCI Telecomms. Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1097 (3d Cir. 1995).  The plaintiff must demonstrate good faith and "'some reasonable basis for noncompliance within the time specified in the rules.'"  Id. (quoting Petrucelli, 46 F.3d at 1312).  The plaintiff must show that he exercised diligence in trying to effect service.  See Himmelreich v. U.S., 285 Fed. Appx. 5, 7 (3d Cir. 2008) (citing Bachenski v. Malnati, 11 F.3d 1371, 1376-77 (7th Cir. 1993)).  Some factors a court may examine in finding good cause include 1) the reasonableness of the plaintiff's efforts to serve, 2) prejudice to a defendant from untimely service, and 3) whether the plaintiff moved for an enlargement of the time to serve.  See MCI Telecomms., 71 F.3d at 1097 (citing United States v. Nuttall, 122 F.R.D. 163, 166-67 (D. Del. 1988)).

As to the second inquiry (discretion), the court may consider and balance several factors including 1) actual notice of the action, 2) prejudice to the defendant, 3) statute of limitations, 4) conduct of the defendant, 5) whether the plaintiff is represented by counsel, and 6) any other relevant factor.  See Chiang v. U.S. Small Bus. Admin., 331 Fed. Appx. 113, 116 (3d Cir. 2009). The plaintiff bears the burden of demonstrating to the court why it should exercise its discretion. Cf. McCurdy v. Am. Bd. of Plastic Surgery, 157 F.3d 191, 196 (3d Cir. 1998) (affirming district court's denial of extension where it concluded "that [plaintiff] had demonstrated no basis to justify the court's discretion to grant an extension of time in which to serve").

13

III.     **DISCUSSION**

    A.     **The Jerkins Group**

Whether service was valid on Rodney Jerkins, RJP, and EMI Blackwood invokes both New Jersey and New York law, where this Court is located and where service was attempted respectively.  See Fed. R. Civ. P. 4(e)(1), (h)(i)(A).  Under Rule 4, the Court finds that neither Rodney Jerkins nor RJP were timely served, and a factual dispute exists as to whether EMI was timely served on the record as presented.  The Court further finds that no good cause exists for a mandatory extension.  However, the Court finds that an exercise of its discretion is warranted as to the entire Jerkins Group, and the Court thus grants Plaintiffs' Cross Motion for an Extension of Time to Serve.  The Court denies the Jerkins Group's Motion to Dismiss.

    1.     **Rodney Jerkins**

       a.     **Actual Service**

Jerkins argues that he was not properly served with process because Plaintiffs did not comply with any of the requirements of Rule 4(e)(2) within 120 days.  Jerkins br. at 4.  He further argues that Plaintiffs did not comply with the requirements of New York law under Rule 4(e)(1) because, *inter alia*, he was not personally served at his place of business.  Jerkins br. at 4.  As to this latter argument, Jerkins insists that he is not an employee of EMI (where Plaintiffs attempted process), he has no office at EMI, and EMI is not and has never been authorized to accept service on his behalf.  Jerkins br. at 4.   Plaintiffs counter by sending a mixed message as to service upon Jerkins.  In the "Statement of Facts," Plaintiffs assert that "the Moving Defendants were properly served."  Pl. br.(74) at 5.  However, in the "Argument" section, Plaintiffs only argue specifically that service was proper on EMI, without mention as to Rodney

14

Jerkins or RJP.  See Pl. br.(74) at 6-7.  As to EMI, Plaintiffs argue that service was proper under New York Law because they were permitted to rely on the representations of EMI's receptionist, Mr. Munsie, that he could accept service.  Pl. br.(74) at 6.  Plaintiffs also argue service on EMI was proper under the "redelivery doctrine."  Pl. br(74) at 7.  To the extent that Plaintiffs' arguments as to service upon EMI are intended to apply to Rodney Jerkins, those arguments fail.

The New York personal service rule is substantially similar to the Federal Rule and the New Jersey rule.  Compare N.Y. Civ. Prac. L & R. § 308, with Fed. R. Civ. P. 4(e)(2), and N.J. R. 4:4-4(a)(1).  The main deviation applicable here is that under New York law, a plaintiff may serve a natural person by serving the summons on a person of suitable age and discretion at the natural person's "actual place of business" and then mailing the summons to the natural person's last known residence or to the person's actual place of business.  N.Y. Civ. Prac. L. & R. § 308(2).  Service at a natural person's actual place of business is not provided for under Rule 4(e)(2).  "Actual place of business" includes "(1) a place where the defendant regularly transacts business, or (2) an establishment that the defendant owns or operates, where there is a 'clear identification of the work performed by her with that place of business.'"  Velez v. Vassallo, 203 F. Supp. 2d 312, 325 (S.D.N.Y. 2002) (quoting King v. Galluzzo Equip & Excavating, Inc., No. 00 Civ. 6247, 2001 WL 1402996, at *4 (E.D.N.Y. Sept. 8, 2001)); see also N.Y. Civ. Prac. L. & R. § 308(6) ("For purposes of this section, 'actual place of business' shall include any location that the defendant, through regular solicitation or advertisement, has held out as its place of business.").  A person can have more than one actual place of business.  Velez, 203 F. Supp. 2d at 325.

The record before the Court does not show that Plaintiffs properly served Jerkins under

either Federal, New Jersey, or New York law.  At no point do Plaintiffs demonstrate that they

timely 1) served Jerkins personally, 2) served him at his ususal place of abode, or 3) served his

agent.  Further, under New York law specifically, Plaintiffs have supplied no evidence that EMI

headquarters was Jerkins's actual place of business.  While it seems clear that he does conduct

some kind of business with EMI, see Jerkins affid. at ¶ 3, Plaintiffs have neither briefed where

and to what degree he transacts this business, nor have they supplied any evidence on this point.

Even if Plaintiffs had shown actual place of business, they have submitted no evidence that they

also mailed a copy of the summons to Jerkins at EMI's headquarters after he was served there, as

is also required by law.  See N.Y. Civ. Prac. L. & R. § 308(2).

As to Plaintiffs' argument regarding reliance on Mr. Munsie, that also fails.  Plaintiffs

rely on Fashion Page, Ltd. v. Zurich Insurance Company, 406 N.E.2d 747 (N.Y. 1980) for the

proposition that "a process server may rely upon someone such as a receptionist to identify the

proper person to accept service."  Pl. br.(74) at 6.  In Fashion Page, the court upheld service of

process on a corporation where a process server left the summons and the complaint with a

secretary who represented that she could accept service.  Id. at 749, 751.  The court held that

"[r]eliance may be based on the corporate employees to identify the proper person to accept

service.  In such circumstances, if service is made in a manner which, objectively viewed, is

calculated to give the corporation fair notice, the service should be sustained."  Id. at 751.

However, Fashion Page is unavailing as to Plaintiffs' service attempt upon Jerkins.  First,

Fashion Page arose in the context of service upon a corporation, not upon a natural person.  See

id. at 750 (citing N.Y. Civ. Prac. L. & R. § 311, which governs service upon a corporation).  The

decision is rooted in the New York corporation service rule and principles of agency as they

apply to corporations. Thus, subsequent courts have not extended its holding to service on individuals. Cf. Espy v. Giorlando, 445 N.Y.S.2d 230, 232 (N.Y. App. Div. 1981) (reversing finding of proper service where service upon defendant-doctor was only effected upon nurse who held herself out as an authorized agent), aff'd, 450 N.Y.S.2d 786 (N.Y. 1982); Edward V. Green Enters., Inc. v. Manilow, 427 N.Y.S.2d 199, 200 (N.Y. Sup. Ct. 1980) (dismissing complaint where plaintiff only served natural person-defendant's "manager"). This Court also finds no reason to extend Fashion Page to service upon a natural person. Second, even if Fashion Page did apply, it is highly disputed whether Mr. Munsie actually said that he was authorized to accept service on behalf of any Defendant. Compare Munsie affid. at ¶¶ 1, 4, 6, 7, with Frias affid. at ¶¶ 3, 4, 6, 7. Thus, this Court would be called upon to make factual determination as to each affiant's credibility, which it cannot do on the present factual record. However, a factual investigation is unnecessary given that Fashion Page does not apply in this context and given that the Court otherwise finds that a discretionary extension of time to serve is warranted.

Plaintiffs also assert that service was effected because New York recognizes the "redelivery" doctrine. Pl. br.(74) at 7. Plaintiffs rely on McDonald v. Ames Supply Co., 238 N.E.2d 726 (N.Y. 1968) for the proposition that "[r]edelivery permits courts to uphold service upon a corporation later found to be improper if: (a) the process server acts with due diligence in attempting to fulfill the statutory requirements of personal delivery; (b) the process server nevertheless serves a person not authorized to accept service; and (c) the recipient then redelivers the papers to one who is authorized to accept service." Pl br.(74) at 7. As a general rule, redelivery of service to a proper party is not sufficient service. See Fashion Page, 406 N.E.2d at 751; Martinez v. Church of St. Gregory, 690 N.Y.S.2d 29, 29 (N.Y. App. Div. 1999). Indeed,

the <u>McDonald</u> court acknowledged that "personal delivery of a summons to the wrong person does not constitute valid person service even though the summons shortly comes into the possession of the party to be served[.]"  238 N.E.2d at 728.  However, importantly for purposes of the present discussion, New York's highest court has held that service upon a natural person is limited to the circumstances described in N.Y. Civ. Prac. L. & R. § 308.  <u>See</u> <u>Macchia v. Russo</u>, 496 N.E.2d 680, 681-82 (N.Y. 1986).

To the extent that Plaintiffs truly intended the redelivery argument to apply to Jerkins, that argument fails.  Plaintiffs have failed to demonstrate how their process server acted with due diligence in attempting personal service upon a natural person by effecting service upon a receptionist.  Service upon Mr. Munsie cannot be said to fit any of the statutory grounds provided in N.Y. Civ. Prac. L. & R. § 308.  Therefore, Plaintiffs did not properly and timely serve Rodney Jerkins.

This conclusion is not remedied by Plaintiffs' subsequent attempt to serve Jerkins at his residence in New Jersey on June 2, 2009.  <u>See</u> Redwine decl. at ¶ 14.  Any service on that date was out-of-time and did not constitute proper service under Rule 4.  Since Jerkins was not properly served, the Court must examine whether good cause exists for granting an extension, or whether this Court is justified in exercising its discretion to permit additional time for service.

### b.     Rule 4(m)

### (1)     Good Cause

Jerkins argues that no good cause exists for granting an extension of time to serve or for this Court to exercise its discretion, chiefly because Plaintiffs were dilatory in their service

efforts.  Jerkins br. at 8-9; Jerkins reply at 7-8.[8]  Plaintiffs' good cause argument-in-chief is that they acted reasonably because 1) they were actively trying to settle the case, 2) Plaintiffs were at times attempting to secure new counsel, and 3) Plaintiffs believed that service had been properly effected.  See Pl. br.(74) at 8.  The Court finds Plaintiffs' tripartite argument for not complying with the 120 day limit is unreasonable.

First, their assertion that they were "actively" engaged in settlement attempts is specious.  The record produced by Plaintiffs themselves unequivocally shows that Stephen Dallas (Senior Director for Legal and Business Affairs at EMI) rejected Plaintiffs' settlement overtures as of February 24, 2009 – a full 56 days before the service period expired.  This is significant as to Jerkins because Plaintiffs state that "they understood this rejection to be on behalf of all Moving Defendants, not just EMI."  Pl. br.(74) at 3.  Plaintiffs have not sufficiently explained, if at all, why this rejection should not have prompted service attempts.  To the extent that they argue their second rationale (the attempt to secure new counsel) illuminates the failure, that argument is unpersuasive also.  Even if Plaintiffs at some point during the service period were proceeding pro se, their self-representation is not sufficient to excuse a failure to timely serve process.  See Sykes v. Blockbuster Video, 205 Fed. Appx. 961, 963 (3d Cir. 2006) (holding "[pro se litigant's] ignorance of the rules would not provide good cause to excuse his failure to serve the defendants within the time allotted under the rules").  Finally, Plaintiffs cannot logically argue that the delay in timely serving Jerkins was caused by their "rational belief" that he had been timely served.

---

[8] Each of the Jerkins Group also argues that Blige's claim that she will be prejudiced if the Court grants their Motion to Dismiss are unfounded.  Jerkins reply at 7-8.  Since the Court otherwise finds that a discretionary extension is warranted here, analysis of prejudice to Blige is moot.

Plaintiffs did not attempt service on Jerkins until the 120th day.  Thus their "rational belief" perhaps explains why they did not try to serve Jerkins again on April 20, but it certainly does not explain the previous 119 days of inactivity.

None of the other factors in this inquiry compel finding good cause.  While the only prejudice that Jerkins has stated is the potential damages he will face from a successful suit, and while this is certainly not prejudice from the delay but rather potential harm from the suit, the "absence of prejudice alone can never constitute good cause to excuse late service."  MCI Telecomms., 71 F.3d at 1097.  Additionally, at no point did Plaintiffs ever move for an enlargement of the time for service.  While such a failure alone is not fatal to a finding of good cause, see Cunningham v. New Jersey, 230 F.R.D. 391, 394 (D.N.J. 2005), it does shed negative light on Plaintiffs' arguments.  Cf. McCurdy, 157 F.3d at 196; MCI Telecomms., 71 F.3d at 1097.

Therefore, in light of each of the factors examined above, Plaintiffs have not demonstrated good cause for the delay in service as to Defendant Jerkins.

### (2)     Discretion

Nevertheless, Plaintiffs argue that the running of the statute of limitations warrants granting a discretionary extension.  See Pl. br.(74) at 12-14.  While that factor only weighs somewhat in Plaintiffs' favor, the Court finds that the balance of factors weigh in favor of granting a discretionary extension to serve process on Jerkins.

First, the record strongly suggests that Jerkins (and RJP by proxy) had actual notice of this action well-within the service period.  Jerkins represents that he is a songwriter who had a contractual relationship with EMI.  Jerkins affid. at ¶ 3.  Plaintiffs sent the initial package

containing the complaint to Jerkins c/o EMI Music on December 22, 2008, see Pl. br.(74), Ex. A, and then later Stephen Dallas, "on behalf of [EMI] and its writers," rejected Plaintiffs' claims in the complaint.  Pl. br.(74), Ex. E.  As Jerkins was one of these writers, it seems that Dallas represented that Jerkins had notice of the suit.  Moreover, in his affidavit in support of the Motion to Dismiss, Jerkins at no point asserts that he lacked notice of the suit.

Second, even if Jerkins did not have actual notice, the day after Plaintiffs filed suit, the statue of limitations ran on some of their claims.  A discretionary extension is sometimes justified where the limitations period on the underlying action has subsequently expired between filing and attempted service.  See Rule 4(m) advisory committee notes on the 1993 amendments ("Relief may be justified, for example, if the applicable statute of limitations would bar the refiled action"); Petrucelli, 46 F.3d at 1305-06 (citing note).  Where a party files suit near the end of the limitations period, however, a court is justified in viewing the statute of limitations factor "in a light less favorable to the plaintiff than might otherwise be the case."  See McCurdy, 157 F.3d at 196.  Moreover, even if a re-filing would be barred by the statute of limitations, a court is not required to extend the time for service.  See MCI Telecomms., 71 F.3d at 1098.  The Court finds that although Plaintiffs admittedly waited until the penultimate day of the limitations period to file suit, this factor still weighs slightly in their favor as a dismissal without prejudice would really be a dismissal with prejudice as to some of their damages.

Third, nothing in the record demonstrates prejudice to Jerkins.  The Third Circuit has held that "[d]elay may damage a defendant's ability to defend on the merits," Boley v. Kaymark, 123 F.3d 756, 759 (3d Cir. 1997); however, the Court is not convinced that Plaintiffs' dilatoriness hurt Jerkins's ability to defend.  This factor weighs in favor of granting an extension.

Fourth and finally, while Plaintiffs' arguments in favor of good cause (they were actively trying to settle the case, Plaintiffs were at times attempting to secure new counsel, Plaintiffs believed that service had been properly effected) did not support such a finding, two of those arguments bear on this Court's exercise of discretion.  While Plaintiffs were not actively trying to settle the case for the entirety of the 120 days, at least some significant portion of it was spent trying to do so.  Further, it does appear that Plaintiffs were attempting some change in counsel, see Docket No. 4 (Motion to Withdraw as Attorney filed by William Heller on March 31, 2009), which at least explains some of the delay.  Given that these appear to be otherwise plausible reasons for Plaintiffs' untimely service of process, they weigh in favor of granting an extension.

Therefore, after weighing the above factors, the Court finds that a discretionary grant of additional time to service process is warranted.  The Court denies Jerkins's Motion to Dismiss and grants Plaintiffs' Motion for an Extension.  Plaintiffs shall serve process on Rodney Jerkins per the terms of the accompanying Order.

### 2.    Rodney Jerkins Productions, Inc.

#### a.    Actual Service

RJP argues that it was not properly served with process because Plaintiffs did not comply with any of the requirements of Rule 4(h)(1) (corporate service rule), N.Y. Civ. Prac. L & R. § 311(a)(1) (same), or N.J. R. 4:4-4(a)(6) (same).  Specifically, RJP argues that Plaintiffs' attempted service by leaving process with Mr. Munsie at EMI was ineffective.  Jerkins br. at 5.  RJP argues that neither EMI nor Mr. Munsie were officers, directors, or agents of RJP.  Jerkins br. at 5.  As with Jerkins, Plaintiffs counter with the same mixed message as to service upon RJP.  They once again seemingly argue that service was proper because they were permitted to rely on

Mr. Munsie's representations that he was authorized to accept service, and/or, the redelivery

doctrine salvages their service attempt.  See Pl. br.(74) at 6-7.  Both of these arguments fail.

It is not disputed that Plaintiffs did not leave service with any officer, director, trustee, or

cashier or assistant cashier of RJP.  See Fed. R. Civ. P. 4(h)(1)(B); N.Y. Civ. Prac. L & R. §

311(a)(1), N.J. R. 4:4-4(a)(6).  The dispute is essentially over whether Mr. Munsie was some

kind of agent of RJP under New York law, specifically under the principles of Fashion Page as

discussed above.  Fashion Page requires more than the mere asking of a person whether he is

authorized to accept service of process.  406 N.E.2d at 751.  In fact, the rule laid out in that

matter requires that the circumstances of each case be examined, including whether the server

determined if the person was employed by the corporation and if the person was in fact

authorized to accept service.  See id.; see also Martinez v. Church of St. Gregory, 690 N.Y.S.2d

29, 29 (N.Y. App. Div. 1999) (holding service on receptionist improper where he never said he

was authorized to accept service).  Fashion Page also appears to require that the server must go to

the corporation's actual offices.  Cf. 406 N.E.2d at 751 ("But when the corporation is regularly

doing business in the State, it generally cannot be heard to complain that the summons was

delivered to the wrong person when the process server *has gone to its offices*, made proper

inquiry of the defendant's own employees, and delivered the summons according to their

directions." (emphasis added)).

Under these standards, RJP was not properly served.  While perhaps Frias did ask Mr.

Munsie if he was authorized to accept service on behalf of RJP (though this is disputed), he was

at the offices of EMI at the time of his inquiry.  The only evidence in the record of RJP's address

is the address to which Plaintiffs mailed their initial package to RJP (at EMI's office's), but no

23

evidence exists to suggest where it could actually be found.  In fact, Plaintiffs supplied a

"Business Entity Status Report" showing that RJP's agent could be found in Smithville, New

Jersey and that RJP maintains its "Main Business Address" in Longwood, Florida.  Pl. br.(74),

Ex. H.  Under this evidence, Plaintiffs had no reason to believe that service on Mr. Munsie at

EMI's headquarters was sufficient service on RJP, whatever his representations were and

regardless of Plaintiffs' previous mailings.  In other words, objectively viewed, they did not give

RJP fair notice of the suit with their service at EMI.  See Fashion Page, 406 N.E.2d at 751.

Additionally, the "redelivery" doctrine does not remedy Plaintiffs' service failure.  It is

not clear on the record if Mr. Munsie or some intermediary did in fact deliver service to RJP.

Further, no evidence exists to suggest that Plaintiffs used due diligence in relying on the

representations of a receptionist at an office foreign to RJP.  See Leo v. Gen. Elec. Co., 111

F.R.D. 407, 412 (E.D.N.Y. 1986); see also Lowney v. New York State Div. of Human Rights,

889 N.Y.S.2d 463, 463 (N.Y. App. Div. 2009) (holding invalid process attempt on state officer

where process left with secretary, even though officer ultimately received actual notice of

proceeding).  Even though Frias seemingly asked Mr. Munsie if RJP could be found at EMI's

headquarters, it would seem a strange result to find valid service where a process server effects

service at a location where a corporation cannot be found – regardless of the receptionist's

response.  Therefore, Plaintiffs did not properly and timely serve RJP.

This conclusion is not remedied by Plaintiffs' subsequent attempt to serve RJP on May

26, 2009 at the office of its registered agent for service, Raymond Kondler, and at Rodney

Jerkins's Florida home.  Any service on that date was out-of-time and did not constitute proper

service under Rule 4.  Since RJP was not properly served, the Court must examine whether good

cause exists for granting an extension or whether this Court is justified in exercising its discretion to permit additional time for service.

### b.        Rule 4(m)

#### (1)        Good Cause

RJP makes the same arguments as Jerkins regarding Rule 4(m), specifically that Plaintiffs were dilatory in their service efforts.  Jerkins br. at 8-9; Jerkins reply at 7-8.  Plaintiffs' good cause argument is likewise the same.  <u>See</u> Pl. br.(74) at 8.  For the reasons expressed above in section III.A.1.b.(1), the Court finds no good cause for Plaintiffs delay in service on RJP.

#### (2)        Discretion

Likewise, for the reasons expressed above in section III.A.1.b.(2), the Court finds that a discretionary grant of additional time to serve process on RJP is warranted.  The Court denies RJP's Motion to Dismiss and grants Plaintiffs' Motion for an Extension.  Plaintiffs shall serve process on RJP per the terms of the accompanying Order.

### 3.        EMI Blackwood

#### a.        Actual Service

EMI argues that it was not properly served with process because service was not made upon an officer, director, trustee, or any agent.  Jerkins br. at 6.  It particularly objects to service on Mr. Munsie as he fills none of those roles.  Jerkins br. at 7.  Plaintiffs offer that service was proper because they were permitted to rely on Mr. Munsie's representations that he was authorized to accept service, and/or, the redelivery doctrine salvages their service attempt.  <u>See</u> Pl. br.(74) at 6-7.  The Court rejects these arguments at this time.

Returning to <u>Fashion Page</u>, the Court is presented with a factual dispute as to whether

service upon Mr. Munsie was actually sufficient service on EMI.  Mr. Munsie's status does not seem in dispute, i.e., he is not an officer, director, trustee, and under most circumstances, not an agent.  But based on the affidavit from Kelvi Frias, the Court is not convinced that EMI was not otherwise properly served in this instance through Mr. Munsie under the <u>Fashion Page</u> standard. It seems that perhaps Mr. Munsie represented that he was authorized to accept service and did in fact do so.  Frias affid. at ¶¶ 4-5.  As that representation is flatly disputed, <u>see</u> Munsie affid. at ¶¶ 5-8, this Court is called upon to make a factual determination, which it cannot do on the record presented.  However, given that the Court otherwise finds that an exercise of its discretion is warranted under Rule 4(m), factfinding is unnecessary at this time.

As to the redelivery doctrine, a factual dispute also exists that precludes a finding of valid service at this time.  The Court cannot determine on the record whether Frias did in fact ask Mr. Munsie if he worked for EMI and if he actually asked if Mr. Munsie was authorized to accept service.  Thus, the Court cannot determine whether Plaintiffs exercised due diligence in attempting service on EMI.  <u>See</u> <u>Leo</u>, 111 F.R.D. at 412-13.

Plaintiffs' additional service on EMI on May 22, 2009, <u>see</u> Dallas affid. at ¶ 8, does not otherwise show valid service.  Service on that date was out-of-time under Rule 4.  Thus, the analysis must turn to Rule 4(m).

### b.     Rule 4(m)

#### (1)     Good Cause

For the reasons expressed above in section III.A.1.b.(1), the Court finds no good cause for Plaintiffs delay in service on EMI.

### (2)     Discretion

For all of the same reasons as expressed above in section III.A.1.b.(2), the Court finds that a discretionary grant of additional time to serve process on EMI is warranted.  An additional consideration vis-a-vis EMI is that absolutely no dispute exists as to whether it had notice of the suit well within the service period, as evidenced by Plaintiffs' correspondence with Stephen Dallas.  See Pl. br.(74), Ex. D.  Therefore, the Court denies EMI's Motion to Dismiss and grants Plaintiffs' Motion for an Extension.  Plaintiffs shall serve process on EMI per the terms of the accompanying Order.

### B.     Hamler Group

Whether service was valid on Garrett Hamler, Team S Dot Publishing, and Hitco Music Publishing LLC invokes both New Jersey and California law, where this Court is located and where timely service was attempted respectively.[9]  See Fed. R. Civ. P. 4(e)(1), (h)(i)(A).  Under Rule 4, the Court finds that none of the Hamler Group was timely served.  The Court further finds that no good cause exists for a mandatory extension.  However, the Court finds that an exercise of its discretion is warranted as to the Hamler Group, and the Court thus grants Plaintiffs' Cross Motion for an Extension of Time to Serve.  The Court denies the Hamler Group's Motion to Dismiss.

Before examination of service as to each Hamler Group Defendant, the Court must address the purported waiver issue.  Plaintiffs' argue that counsel for the Hamler Group, Jeffrey Movit, waived objections to service of process as to Hamler, S Dot, and Hitco.  See Pl. br.(72) at

---

[9] As is discussed below, Plaintiffs' service attempts in Georgia and New York on Garrett Hamler were unsuccessful and/or untimely, and thus those states' laws are irrelevant to the present inquiry.

5-6.  Notwithstanding, the attached evidence to Plaintiffs' brief undisputedly shows that, at least in emails, Movit only waived objections as to Blige, not as to the Hamler Group.  <u>See</u> Pl. br.(72), Ex. D ("Per your prior offer, I am authorized to accept service of the Amended Complaint on behalf of Ms. Blige in exchange for your office's signature on the attached stipulation, which stipulation would extend Ms. Blige's deadline to move, answer or otherwise respond to the amended complaint to June 10, 2009.").  Whether Movit made some oral representations in May 2009 is unclear on the record, <u>compare</u> Redwine decl. at ¶ 12, <u>with</u> Movit reply decl. at ¶ 3; however, the near contemporaneous written record only shows a waiver by Blige.  The Court is thus not convinced that the Hamler Group waived any objection to service, and therefore, analysis must turn to the attempted service on each Defendant.

### 1.    Garrett Hamler

#### a.    Actual Service

Whether Garrett Hamler was properly served with process is a short inquiry.  Plaintiffs first allege that they attempted service on Hamler at his music publishing company in Georgia on April 20; however, they readily acknowledge that he was not then served.  <u>See</u> Pl. br.(72) at 4.  Plaintiffs then allege that they attempted to re-serve Hamler the next day in Georgia, and again the following day in New York at BMI's offices.  Pl. br.(72) at 5.  Both of these subsequent attempts were undisputedly out-of-time, and thus cannot constitute valid service.  <u>See</u> Fed. R. Civ. P. 4(m).  Finding no other evidence of timely service upon Hamler, the Court is compelled to find that he was not validly served.  Thus, the inquiry must turn to Rule 4(m).

**b.      Rule 4(m)**

**(1)      Good cause**

Hamler argues that no good cause exists for granting an extension of time to serve because Plaintiffs' attempts at service were unreasonable, he has suffered prejudice from the delay, and the Plaintiffs never moved for an enlargement of the time to serve.  Hamler br. at 11-2; Hamler reply at 10-13.  In response, Plaintiffs once again articulate their tripartite argument showing the diligence of their efforts: 1) they were actively trying to settle the case, 2) the Plaintiffs were at times attempting to secure new counsel, and 3) Plaintiffs believed that service had been properly effected.  Pl. br.(72) at 9.  The Court once again finds unavailing Plaintiffs' good cause arguments.

First, Plaintiffs' assertion that they were "actively" engaged in settlement efforts is particularly specious as to the Hamler Group.  The initial package sent to these Defendants was never once responded to.  See Hamler reply at 10.  Plaintiffs can hardly advocate they delayed serving process for 120 days on the glimmering hope that their package would bear fruit. Second, their assertion that they were attempting to secure new counsel does nothing to alleviate their obligation to serve, nor does it show that they acted reasonably in delaying.  See Sykes, 205 Fed. Appx. at 963.  Third, their belief that they properly effected service explains why they did not attempt re-service on April 20th, but it does not explain their dalliance for the previous 119 days.

As with the Jerkins Group, none of the other factors in the good cause inquiry support finding good cause.  The Hamler Group argues that they will be prejudiced by an extension because they will have to "incur fees and costs in this action" and will be prejudiced by "the

29

potential loss of relevant evidence resulting from the Plaintiffs' dilatory conduct in moving forward with their claims." Hamler reply at 12.  The Court is simply not convinced that the Hamler Group have shown prejudice from the delay.  The potential costs are harm from the suit, not from the delay, and the purported loss of evidence is nebulous and unsupported.  Nevertheless, a mere absence of prejudice does not support good cause.  See MCI Telecomms., 71 F.3d at 1097.  Additionally, the Court notes that at no point did Plaintiffs move for an enlargement of time for service.  While not fatal, the failure militates against finding good cause.  Cf. McCurdy, 157 F.3d at 196; MCI Telecomms., 71 F.3d at 1097.

Therefore, in light of each of the factors examined above, Plaintiffs have not demonstrated good cause for the delay as to Hamler.  However, this does not end the Court's inquiry and analysis must turn to the second part of Rule 4(m).

### (2)    Discretion

As to the discretionary authority under Rule 4, Hamler argues that the Court should abstain from granting an extension because Plaintiffs' filing of the complaint just one day before the end of the limitations period is "a discretionary factor that militates in favor of *denying* a plaintiff's request for additional time to effect service."  Hamler reply at 13-14.  In response, Plaintiffs argue that the running of the statute of limitations warrants granting relief.  Pl. br.(72) at 13-15.  As with the Jerkins Group above, the Court finds that the balance of factors weighs in favor of granting an extension.

First, the record strongly suggests that all of the Hamler Group had actual notice of this action within the limitations period.  In their reply brief, the Hamler Group, regarding Plaintiffs' December 2008 package, state as follows: "As Plaintiffs concede, their so-called settlement

30

efforts were limited to sending one demand letter *that was never responded to* by any of the Moving Defendants . . . ."  Hamler reply at 10 (emphasis added).  They continue: "Sending one (*ignored*) settlement demand letter does not constitute an 'active' settlement . . . ."  Hamler reply at 10-11 (emphasis added).  The emphasized language tellingly shows that these Defendants do not claim that they did not receive the package, which contained the original complaint, but that they received it and ignored it.  Perhaps they received it and also did not read it, but that seems unlikely given the language used.  Furthermore, counsel for the Hamler Group also states in the reply brief that she was regularly monitoring the docket in this action, further showing that these Defendants had timely actual notice of the suit.  See Hamler reply at 5 ("Moving Defendants were notified of those [affidavits of service] by the undersigned counsel, who regularly monitor the docket for this action.").[10]  Thus it appears that the Hamler Group had notice of the suit within the service period, and this factor weighs in favor of granting a discretionary extension.

Second, even if the Hamler Group did not have actual notice, the day after Plaintiffs filed suit, the statute of limitations ran on some of their claims.  The running of the statute of limitations is a relevant factor.  And as further elucidated above in section III.A.1.b.(2), this factor weighs in favor of granting an extension.

Third, nothing in the record demonstrates actual prejudice to any of the Hamler Group.  Their nebulous claim of loss of evidence does not suffice to show that their ability to defend has been hampered.  Cf. Boley, 123 F.3d at 759.  The Hamler Group's claim that they will incur

---

[10] Moreover, it appears that the Hamler Group definitively had notice of the suit within two weeks of the expiration of the filing period, as confirmed by Jeffrey Movit's email to Plaintiffs on May 1, 2009, discussing an extension of time to respond to the complaint.  See Pl. br.(72), Ex. D.

costs of having to defendant what should be time-barred claims, is a claim of prejudice the Third

Circuit has soundly rejected.  See id. at 759 ("We are aware of no decisions refusing to grant an

extension to serve under Rule 4(m) solely on the ground that denying the defendant the benefit of

the running of the statute of limitations amounts to cognizable prejudice.").

Fourth and finally, as explained above in section III.A.1.b.(2), two of Plaintiffs'

arguments in favor of good cause support granting a discretionary extension.

Therefore, after weighing the above factors, the Court finds that a discretionary grant of

additional time to serve process is warranted.  Thus, the Court denies Hamler's Motion to

Dismiss and grants Plaintiffs' Motion for an Extension.  Plaintiffs shall serve process on Garrett

Hamler per the terms of the accompanying Order.

### 2.     Team S Dot Publishing

#### a.     Actual Service

At the outset, the Court must note that Team S Dot Publishing is seemingly a mere alter

ego of Garrett Hamler.  The Hamler Group briefed the service issue as if S Dot was only subject

to the personal service rules under Rule 4(e).   See Hamler br. at 7 (arguing that Plaintiffs did not

comply with Rule 4(e) when attempting service on S Dot).  Plaintiffs briefed the issue as if S Dot

were subject to the corporate service standards under Rule 4(h).  Pl. br.(72) at 6-7.  Without

deciding which rule should govern, the Court examines both and finds that Plaintiffs did not

effect service under either.

As to the personal service standards under Rule 4(e)(2), Plaintiffs have presented no

evidence whatsoever that they delivered a copy of the summons or complaint to S Dot personally

(a/k/a Garrett Hamler), or to S Dot's dwelling or ususal place of abode.  Cf. Fed. R. Civ. P.

4(e)(2)(A)-(B).  Whether Plaintiff's delivered process to S Dot's agent as provided under Rule

4(e)(2)(C) is intertwined with their analysis for compliance with the corporate service rules, to

which the analysis now turns.

Plaintiffs argue that they effected service on S Dot by serving "Roberto S." at the offices

of Bug Music in Los Angles, California.  Pl. br.(72) at 4.  Plaintiffs argue that they properly

served S Dot (and Hitco) under the standards set forth in Direct Mail Specialists v. Eclat

Computerized Technologies, Inc., 840 F.2d 685 (9th Cir. 1988).  Plaintiffs argue that under

Direct Mail, a process server may rely on a receptionist to identify the proper person to accept

service, and that the receptionist here was "so integrated into the company" that service on him

was proper.  See Pl. br.(72) at 7.  They further argue that "[t]he receptionist at Hitco's

headquarters represented that he was authorized to accept service on behalf of Hitco and S Dot,

and Plaintiffs were permitted to rely upon that representation in effecting service."  Pl. br.(72) at

7.  Plaintiffs reliance on Direct Mail and indeed their factual presentation about what occurred

are both misguided.

Direct Mail stands for the specific proposition that a party may serve a corporation

through a representative who is "so closely integrated with the organization that he will know

what to do with the papers."  840 F.2d at 688 (quotations removed).  In Direct Mail, service upon

a receptionist for a corporation was found proper under Rule 4 where she had considerable

discretion at the corporation, including being the sole person in charge of the office at times.  Id.

at 687, 688-89.  The standard from Direct Mail seems to mirror the Third Circuit's definition for

what constitutes a "managing or general agent" under Rule 4(h)(1)(B).  In Gottlieb v. Sandia

American Corporation, 452 F.2d 510, 513 (3d Cir. 1971), the court held that whether an

individual is a such an agent "depends on a factual analysis of that person's authority within the organization."  The court further articulated that a managing or general agent will "have broad executive responsibilities and that his relationship will reflect a degree of continuity."  Id.

In this dispute, the factual record reveals that Roberto S. was not integrated with S Dot, nor did he have any sufficient authority to be called a managing or general agent.  Initially, it seems clear to the Court that "Robert S." and Roberto Rodriguez are the same person.  Further, it seems clear from the record that Rodriguez's responsibilities are limited to answering the phone, taking messages, and accepting packages.  See Rodriguez reply affid. at ¶ 4.  Plaintiffs have presented nothing, apart from a conclusory statement, that he was somehow integrated with S Dot such that service on him was proper.  In fact, little plausible evidence exists in the record to show that Roberto S. worked for either S Dot or Hitco.  Compare Marquez affid. at ¶ 5, with Rodriguez reply decl. at ¶ 3.  Under these circumstances, service on Roberto S. cannot be said to be valid service upon S Dot.

Further, as mentioned, Plaintiffs brief contains a gross mischaracterization of the record.  Plaintiffs assert that "[t]he receptionist at Hitco's headquarters represented that he was authorized to accept service on behalf of Hitco and S Dot, and Plaintiffs were permitted to rely upon that representation in effecting service."  Pl. br.(72) at 7 (citing Marquez affid. at ¶ 6).  In fact, the affidavit of Plaintiffs' process server, Adrian Marquez, states that "I then informed Roberto S. that I needed to serve legal papers on [Hitco and Team S Dot Publishing].  I asked Robert S *to give the documents to the legal department and Roberto S. agreed to do so and accepted them*."  Marquez affid. at ¶ 6 (emphasis added).  The emphasized language illustrates that Marquez never asked Roberto if he was authorized to accept service, but instead merely asked him to deliver

service to the appropriate party.  Plaintiffs had no reasonable basis for believing service on

Roberto S. was proper.  Moreover, even if he *had* said he was authorized to accept service, that

would not have been enough to make him an agent for S Dot or Hitco (assuming he actually

worked for them) absent other circumstances.  Cf. Laffey v. Plousis, No. 05-2796, 2008 WL

305289, at *5 (D.N.J. Feb. 1, 2008) (holding service improper even though fellow employee at

defendant's office said he was authorized to accept service, since apparent authority to accept

service must be created by acts of the principal – not the agent).

Therefore, Plaintiffs did not properly serve process on Team S Dot Publishing.  Thus, the

inquiry must turn to Rule 4(m).

### b.      Rule 4(m)

#### (1)      Good Cause

Both Plaintiffs and the Hamler Group make the same arguments in favor of and in

opposition of a finding of good cause respectively as they did above.  Therefore, for the same

reasons articulated in section III.B.1.b.(1), the Court finds that no good cause exists for granting

an extension of time to serve.

#### (2)      Discretion

However, for the same reasons as articulated in section III.B.1.b.(2), the Court finds that a

discretionary extension is warranted.  Therefore, the Court denies S Dot's Motion to Dismiss and

grants Plaintiffs' Motion for an Extension.  Plaintiffs shall serve process on Team S Dot

Publishing per the terms of the accompanying Order.

### 3.      Hitco Music Publishing LLC

#### a.      Actual Service

The analysis of whether Hitco was actually served mirrors the analysis made as to S Dot above, and the Court finds that it was not actually serviced.  However, the Court is compelled to add some additional remarks.  Plaintiffs dedicated their entire brief as to actual service on Hitco as if it were a corporation.  See, e.g., Pl. br.(72) at 6 ("Service of a summons and complaint upon a corporation may be accomplished either . . . .").  But notably, Hitco is not a corporation; it is a limited liability company.  While Rule 4(h) applies equally to corporations and LLC's, see Poparic v. Lincoln Square Video, No. 08 C 3491, 2009 WL 1809922, at *1 (N.D. Ill. June 25, 2009), California has specific service rules for LLC's.  See Cal. Corp. Code § 17061.  Notwithstanding, since Plaintiffs have provided no argument supporting service under the California LLC service rules, the Court will not engage in a *sua sponte* analysis.

#### b.      Rule 4(m)

##### (1)      Good Cause

Both Plaintiffs and the Hamler Group make the same arguments in favor of and in opposition to a finding of good cause respectively as they did above.  Therefore, for the same reasons articulated in section III.B.1.b.(1), the Court finds that no good cause exists for granting an extension of time to serve.

##### (2)      Discretion

However, for the same reasons as articulated in section III.B.1.b.(2), the Court finds that a discretionary extension is warranted.  Therefore, the Court denies Hitco's Motion to Dismiss and grants Plaintiffs' Motion for an Extension.  Plaintiffs shall serve process on Hitco Music

Publishing LLC per the terms of the accompanying Order.[11]

### C.   Brockman Group

Whether service was valid on Craig Xavier Brockman and Craigman Music invokes both New Jersey and New York law, where this Court is located and where service was attempted respectively.  See Fed. R. Civ. P. 4(e)(1), (h)(i)(A).  Under Rule 4, the Court finds that neither Brockman nor Craigman Music were timely served.  The Court further finds that no good cause exists for a mandatory extension.  However, the Court finds that an exercise of its discretion is warranted as to the entire Brockman Group, and the Court thus grants Plaintiffs' Cross Motion for an Extension of Time to Serve.  The Court denies the Brockman Group's Motion to Dismiss.

### 1.   Craig Xavier Brockman

#### a.   Actual Service

Brockman asserts that he was not properly served because Cherry Lane Music, nor any employee thereof, was his agent for service.  Brockman br. at 3.  Plaintiffs send a mixed message as to whether they believe Brockman was personally served.  In their "Statement of Facts" Plaintiffs state that they served both Brockman and Craigman Music, but in the "Argument" section they only argue proper service on Craigman Music.  See Pl. br.(86) at 4, 5-7.  As to Craigman Music in particular, Plaintiffs argue that it was properly served under the rule of

---

[11] In Plaintiffs' brief in opposition to the Hamler Group's Motion, Plaintiffs imply that they are entitled to fees and costs associated with defending the Motion.  See Pl. br.(72) at 6. The Hamler Group appropriately points out that Plaintiffs' request has not been lodged in the form of a motion, and it is thus not properly raised.  See Hamler reply at 14.  The Court agrees and will not entertain sanctions at this time.

Fashion Page.[12]  See Pl. br.(86) at 6.  They further argue that they reasonably believed that Keith Hauprich was an agent for Craigman Music.  Pl. br.(86) at 6-7.  To the extent that Plaintiffs' arguments as to service upon Craigman Music apply with equal force to Brockman, those arguments fail.

Revisiting the applicable rules for service of a natural person under New York, New Jersey, and Federal law (as discussed above in section III.A.1.a), the Court is not convinced that Brockman was properly served.  First, Plaintiffs have produced no evidence that he was timely served personally or served at his usual place of abode.  Further, to the extent that they would argue that Cherry Lane Publishing was his actual place of business, see N.Y. Civ. Prac. L. & R. § 308(2), they have provided no briefing or evidence in support thereof.

Instead, Plaintiffs' assertions as to service on Brockman (to the extent they have made any) appear based on the idea that Cherry Lane, and its employees, were somehow Brockman's agents for service.  There is simply no support for this assertion.  First, Fashion Page does not extend to service upon an individual, cf. Espy, 445 N.Y.S.2d at 232; Edward V. Green, 427 N.Y.S.2d at 200.  Thus, Plaintiffs' reliance thereon is misplaced.  Second, Hauprich's purported statement that he was authorized to accept service on behalf of Brockman (which is disputed) alone does not make him Brockman's agent for service of process.  See Laffey, 2008 WL 305289, at *5.  Plaintiffs needed to demonstrate some act by Brockman that led them to believe that Hauprich was his agent, not a unilateral act by Hauprich alone.  Cf. id. (holding service improper even though fellow employee at defendant's office said he was authorized to accept

---

[12] Plaintiffs cite first to M'Baye v. World Boxing Ass'n, 429 F. Supp. 2d 652 (S.D.N.Y. 2006); however, that case is based on the rule in Fashion Page.  See id. at 659.

service, since apparent authority to accept service must be created by acts of the principal – not

the agent).  Merely because Plaintiffs had previously sent a letter to Cherry Lane's offices that

seemingly came into Brockman's possession, see Redwine decl. at ¶¶ 5-6, does not mean that

employees at that location were Brockman's agents.  Likewise the Court is unclear why a listing

on the ASCAP website showing Cherry Lane as the contact for Craigman Music implies that

Cherry Lane is Brockman's agent for service of process.  See Redwine decl. at ¶¶ 4-5.  Therefore,

Plaintiffs did not properly serve Brockman.

Furthermore, this conclusion is not remedied by Plaintiffs' subsequent service attempt in

California on June 2, 2009, see Redwine decl. at ¶ 12, since that attempt was out-of-time.  See

Fed. R. Civ. P. 4(m).  Thus, the Court must examine whether good cause exists for an extension

of time to serve, or whether a discretionary extension is warranted.

### b.        Rule 4(m)

#### (1)        Good Cause

Brockman and Craigman Music argue that no good cause exists for an extension of time

to serve because Plaintiffs cannot show good faith, Plaintiffs did not move for an enlargement of

time to serve, and Plaintiffs further waited six weeks after the service period to effect additional

service.  Brockman br. at 5-6.  Plaintiffs counter with their now familiar three-part refrain: 1)

they were actively trying to settle the case, 2) they were seeking new counsel, and 3) they

believed that they had effected service.  See Pl. br.(86) at 8.  The Court must once again reject

that tune.

First, Plaintiffs' assertion that they were "actively" engaged in settlement efforts carries

no water as to the Brockman Group.  Plaintiffs themselves represent that on January 19, 2009,

LaTanya Milburn, Brockman's manager, telephoned to acknowledge receipt of Plaintiffs'

package and to reject Plaintiffs' claims.  <u>See</u> Redwine decl. at ¶ 6.  Plaintiffs' counsel even states

"[Plaintiffs] understood this rejection to be on behalf of both [Brockman and Craigman]."

Redwine decl. at ¶ 6.  Plaintiffs' delay in service after this early, unequivocal rejection is

inexplicable.  Second, their assertion that they were attempting to secure new counsel does

nothing to alleviate their obligation to serve, nor does it show that they acted reasonably in

delaying.  <u>See</u> <u>Sykes</u>, 205 Fed. Appx. at 963.  Third, their belief that they properly effected

service explains why the did not attempt re-service on April 20th, but it does not explain their

dalliance for the previous 119 days.

As with the Jerkins Group and the Hamler Group, none of the other factors in the good

cause inquiry support finding good cause.  The Brockman Group argues that they will be

prejudiced by an extension because they will have to "defend against potentially stale claims, the

potential loss of relevant evidence, and having to incur fees and costs in this action as a result of

Plaintiffs' dilatory conduct in moving forward with their claims."  Brockman reply at 12-13.  The

Court is simply not convinced that the Brockman Group have shown prejudice from the delay.

The potential costs are harm from the suit, not from the delay, and the purported loss of evidence

is unsupported.  Nevertheless, a mere absence of prejudice does not support good cause.  <u>See</u>

<u>MCI Telecomms.</u>, 71 F.3d at 1097.  Additionally, the Court notes that at no point did Plaintiffs

move for an enlargement of time for service.  While not fatal, the failure militates against finding

good cause.  <u>Cf.</u> <u>McCurdy</u>, 157 F.3d at 196; <u>MCI Telecomms.</u>, 71 F.3d at 1097.

Therefore, in light of each of the factors examined above, Plaintiffs have not

demonstrated good cause for the delay as to Brockman.  However, this does not end the Court's

inquiry and the analysis must turn to the second part of Rule 4(m).

### (2)   Discretion

As with the other Defendants, the Court finds that a discretionary extension is warranted. First, the case for actual notice as to the Brockman Group is the strongest of any the Court has yet considered. Plaintiffs have presented undisputed evidence that LaTanya Milburn, Brockman's manager, called them on January 17, 2009 (less than one month after the complaint was filed) to acknowledge receipt of Plaintiffs' package and to reject their claims. See Redwine decl. at ¶ 6; Brockman reply at 8-9. Thus, Brockman and Craigman both had clear notice of the suit well-within the service period, which weighs in favor of granting an extension.

Second, the day after Plaintiffs filed suit, the statute of limitations ran on some of their claims. The running of the statute of limitations is a relevant factor. And as further elucidated above in section III.A.1.b.(2), this factor weighs in favor of granting an extension.

Third, nothing in the record demonstrates actual prejudice to any of the Brockman Group. Their nebulous claim of loss of evidence does not suffice to show that their ability to defend has been hampered. Cf. Boley, 123 F.3d at 759. Their claim that they will incur costs from having to defend what should be time-barred claims, is a claim of prejudice the Third Circuit has soundly rejected. See id. at 759 ("We are aware of no decisions refusing to grant an extension to serve under Rule 4(m) solely on the ground that denying the defendant the benefit of the running of the statute of limitations amounts to cognizable prejudice.").

Fourth and finally, as explained above in section III.A.1.b.(2), two of Plaintiffs' arguments in favor or good cause support granting a discretionary extension.

Therefore, after weighing the above factors, the Court finds that a discretionary grant of

additional time to serve process is warranted. Thus, the Court denies Brockman's Motion to Dismiss and grants Plaintiffs' Motion for an Extension. Plaintiffs shall serve process on Craig Brockman per the terms of the accompanying Order.

### 2. Craigman Music

#### a. Actual Service

At the outset, exactly what Craigman Music is remains unclear. Brockman attests that it is his "publishing company," but also attests that it "is not a corporate entity." Brockman decl. at ¶ 3. Thus, whether Craigman is a mere alter ego, a sole proprietorship, or perhaps a limited liability company is unknown. Since Craigman briefed the service issue as if it were subject to the personal service standards under Rule 4(e) and Plaintiffs briefed the issue as if Craigman Music were subject to the business service rules under Rule 4(h), the Court will address both.

The sole claim of timely service on Craigman arises from Plaintiffs' attempted service on Keith Hauprich at the offices of Cherry Lane Music Publishing in New York. Craigman maintains that neither Cherry Lane nor any of its employees were authorized agents of Craigman Music. See Brockman reply at 6. Plaintiffs assert that under Fashion Page they were permitted to rely on Hauprich's purported representation that he could accept service on Craigman's behalf (which is disputed), and even if Craigman is not a corporation, they reasonably believed that Hauprich was Craigman's agent. See Pl. br.(86) at 6-7. Plaintiffs' assertions are incorrect.

As discussed at length above, to apply Fashion Page a party must at least show that the process server was at the entity's actual address. Cf. 406 N.E.2d at 751 ("But when the corporation is regularly doing business in the State, it generally cannot be heard to complain that the summons was delivered to the wrong person when the process server *has gone to its offices*,

made proper inquiry of the defendant's own employees, and delivered the summons according to their directions." (emphasis added)).  In this case, Plaintiffs have made absolutely no showing that Craigman maintained offices at Cherry Lane Publishing.  Plaintiff's evidence that the ASCAP website shows that Craigman can be contacted c/o Cherry Lane (at least as of December 2008), does not show that Cherry Lane's offices is where Craigman could be served.

The Court also cannot find support for Plaintiffs' general assertion that they had reason to believe that Cherry Lane and/or Hauprich were Craigman's agent for service of process.  Merely because Plaintiffs at one point mailed something to Cherry Lane to which Craigman later responded (i.e., the package and the phone call from LaTanya Milburn) does nothing to show that Cherry Lane was Craigman's agent.  In sum, Plaintiffs have not demonstrated that Cherry Lane or Hauprich were Craigman's agent for service of process.

Therefore, Plaintiffs did not actually timely serve Craigman.  Plaintiffs' purported additional service attempts in May and July 2009, see Redwine decl. at ¶ 12, are irrelevant here as they were untimely.  See Fed. R. Civ. P. 4(m).  The Court must thus turn to Rule 4(m) for additional analysis.

### b.    Rule 4(m)

#### (1)    Good Cause

As to good cause, for the same reasons articulated in section III.C.1.b.(1), the Court finds that no good cause exists for granting an extension of time to serve.

#### (2)    Discretion

However, for the same reasons as articulated in section III.C.1.b.(2), the Court finds that a discretionary extension is warranted.  Therefore, the Court denies Craigman's Motion to Dismiss

and grants Plaintiffs' Motion for an Extension.  Plaintiffs shall serve process on Craigman Music

per the terms of the accompanying Order.

**IV.     CONCLUSION**

For the foregoing reasons, the Court **DENIES** the Jerkin Group's Motion to Dismiss, the

Court **DENIES** the Hamler Group's Motion to Dismiss, and the Court **DENIES** the Brockman

Group's Motion to Dismiss.  Further, the Court **GRANTS** Plaintiffs' three Cross Motions for an

Extension of Time to Serve Process on Rodney Jerkins, Rodney Jerkins Productions, Garrett

Hamler, Team S Dot Publishing, Hitco Music Publishing LLC, Craig Brockman, and Craigman

Music.  Plaintiffs shall serve process according to the terms of the accompanying Order.


Date:   3-1-10                                                /s/ Robert B. Kugler
                                                             ROBERT B. KUGLER
                                                             United States District Judge